Good morning, your honors. Brian Newman and Ryan Okabe for the appellant Christopher Tobie. The government would have you believe that in the early morning hours of August 12, 2008, two FBI agents knocked on the door of Mr. Tobie and calmly asked to enter and quietly questioned him regarding the contents of his computer and whether or not he had pornography on his computer. This is certainly contrary to the facts of the case and the issues involved in this appeal. Your honor, it is the appellant's position that in fact the agents were interrogating Mr. Tobie assuming that they were professional and they intentionally acted in a manner to create an atmosphere of apprehension and fear of Mr. Tobie to create an unbalanced mental and psychological state by separating Mr. Tobie from his girlfriend, by threatening to search his girlfriend's computer, to go through his work and search his work computer, that they separated him, that they directly accused him during the interrogation of having child pornography on his computer. They did that so numerous times. On the time, on the two or three times that Mr. Tobie did ask for his what were his rights, the agents skillfully diverted those inquiries by saying he was not under arrest and they did not have a warrant. Now, when they asked him if they could look at his computer, what response did he give? He at that was at the latter part of the interrogation, your honor. After all the pressure that had been applied to him, he just described what response did he give? Yes. At that time, he did deny that right. He asserted his rights. He did. He understood he had those rights. Well, he did ask for that and the agents did say they did not have a search warrant to search his computer. And he exercised his right to decline the search, right? So at the time, he did know that he had the right to exercise that right. He did exercise that right. Why shouldn't we take that as evidence that he was not overwhelmed? Because we could take that as evidence that he was overwhelmed with regard to his conduct, his statements concerning the actual images on the computer, because he did exercise that right when he was told he did have that right to refuse. And by being directly accused of having illegal pornography on his computer and by asking what his rights were and just by diverting him that question by saying, oh, well, you're not under arrest, you don't have a warrant, if he was an attorney, then certainly he might have been aware that, oh, well, because we didn't have a warrant, you're not under arrest, you have a right to ask us to leave. But certainly he was in a situation where his support, his girlfriend, who was there in the house that early in the morning, was told to leave the room, was put into a bedroom. He was not allowed to leave to go to work at his usual time and place, to leave for work. The questioning continued at a more rapid pace. Your Honors, I'm not arguing and we're conceding. You're not talking about the police or the agents using a rubber hose and a spotlight in their face. But it was no less coercive in the circumstances, it was no less accusatory in directly telling Mr. Tobey that they knew that he had illegal child pornography on his computer. Did the agents ever tell Mr. Tobey that he was free to leave, or maybe more appropriately, since he was in his own house, that he was free to tell them to go away and would suffer no adverse consequences from having told them to go away? He was never told that. He was never inferred that, that he was free to leave. He actually told the agents that he was late for work, that his usual time for, he told the agents what his usual time to leave for work was, and the agents continued to question him unabated. They never even inferred that he had a right to ask them to leave or that he had a right to walk out of that house. Not that he would have just left the agents in the house and him leaving, the circumstances being that this was his residence. It seemed to me, though, that if you look at this, that it's, a lot of it boils down to whether he was informed about whether he was free to leave. And I think your brief focuses to a large degree on these Hayden factors. And we have the Craighead factors, which are in-house or in-home interrogation. Do you think it matters which case we use as the foundational premise, or should we use both of them? No, Your Honor, I think we should use both of them because he was in his house, but he was put off balance by the circumstances involved in the interrogation. It was relentless. It was an hour. It was continuous. It was accusatory. He said he was scared to death. Well, but, you know, there would be very few under the principles you just articulated. That's basically true of any interrogation or questioning, whether it's at home or elsewhere, is that you continue it. People are often scared. Here you didn't have an overwhelming police or officer presence. So if you had the circumstances you articulate, virtually every interrogation would be custodial. So there has to be something that makes it move over the line from non-custodial to custodial. What do you think are the most significant factors here? Well, Your Honor, first of all, I don't concede that it wasn't overwhelming police. I mean, we didn't have an army of police officers, true, but we still have two-on-one very experienced FBI agents. We did have removed any source of support by his girlfriend being told to leave. We do have a situation where he was told that, you know, if you didn't cooperate, we were going to look at your computer at work, which brings into the question. Do you think it matters vis-a-vis the girlfriend that the nature of this case was child pornography, as opposed to, say, drugs? Yeah, I think it does, Your Honor, because, well, you know, as it turns out, you know, Mr. Tobey and his girlfriend had a child fetish dealing with dressing up in children's clothes, and that was the basis of their relationship, you know, so that had she been in the room, certainly that would have lent at least a moral support for Mr. Tobey, and he wouldn't have been as possibly. I mean, it's all speculation, of course, as taken aback. But I think the situation … Yeah, you think that just sort of up front it might be more logical that, as the officer suggested and has suggested in the brief, that you might also not want to have the girlfriend there for embarrassing purposes because what you're asking about is child pornography. They don't know at that point that they're teamed up on some of these issues, right? It's possible, but however, as we learned in the FBI reports, is that the initial report, which had come several years earlier, were from an earlier relationship that Mr. Tobey had with a girlfriend in another state who had reported to the FBI two or three years earlier that he had kept pornography on his computer. And, Your Honor, if I could reserve a minute. You may. Thank you. Good morning. May it please the Court, Corey G. on behalf of the government. May it please the Court, I'd like to just address three points very briefly. First, Your Honor, the district court in this case made factual findings that in some there really was no indication that the defendant was under arrest. I'm sorry. Could you speak up a little? No indication that the defendant was? That he was under arrest, that there's no indication that there was. Under arrest? Not under duress, but under arrest? Yes. Okay. That simply the agents asked permission to come into the defendant's home. Yeah. But custodial does not necessarily mean arrest. I mean, if he's under arrest, then there's no ambiguity. All the cases that we worry about are where he's not under arrest, but nonetheless there's custodial interrogation. Yes. That is true, Your Honor. The district court did essentially find that there's no indication that the defendant was in custody in this case. And one of the reasons is he wasn't under arrest, he was invited in to the home, he wasn't browbeaten in any way, and the defense agreed during the motion to suppress hearing, he conceded that the defendant was not browbeaten in any way. And that essentially there are no facts to indicate that there was any coercion on the part of the agents. Well, you know, coercion is a funny word. The whole circumstance, I mean, they show up at his door uninvited at quarter to 7 in the morning, an unusual circumstance. It's very clear as you read the transcript that he is very frightened and he's somewhat confused. So for you to say there's no coercion, that may or may not be true as a matter of law, but as a matter of ordinary human relations, they are planning this in order to intimidate him and in trying to get him to say things. What we do with that as a matter of legal conclusion is a different question. Certainly, Your Honor. But as previously mentioned by Your Honor is that just because an agent comes in, asks for permission to talk to him, to investigate a case, doesn't necessarily mean that the defendant was coerced and that the facts indicate that there was a – that it established some kind of a custodial interview. In this case, that's – When Mr. Tobey asks the agents, they say, can we look at your computer? At that point, he says, wait a minute, what are my rights? The agent says, I will tell you what your rights are. But at that point, she does not say – in fact, as I read the transcript, she never says, your rights include the ability to leave or to tell us to go away. So even after she says, I am going to tell you your rights, she does not tell him the most important right. That is correct, Your Honor. So is he to believe then, after she said, I've told you your rights, when she omits that, that she's told him his rights? I mean, what am I to make of that statement when she precedes it by saying, I'm going to tell you your rights? Well, first of all, Your Honor, it is true that the agent never said, you have the right not to speak with me and you have the right not to leave. Right. She did not say that. But she also said, I will tell you your rights. Yes. And she never said that. No, she didn't. However, I don't believe that the agent had any obligation to tell him the Miranda rights or any other rights. Well, but my question is, does she bring the obligation upon herself when she says, I will tell you your rights, and then she doesn't? Well, what I believe she was doing was, at that point, the defendant was not in custody. So at that point, the officer or the agent did not have any duty to say, you have the right to remain silent. I understand that. That's not my question. In response to his question, or request, would you please tell me your rights, she had simply said, well, you're not under arrest. That's a different matter. But she said, I will tell you your rights. And then she didn't. And in a sense, she inferred it by saying that we don't have an arrest warrant, we don't have a search warrant, by asking to come into the house and saying, can we speak with you? Do you have some time? And the defendant agreeing to let the agents in, that is a huge indication that he has a right to refuse them. He has a right not to open the door. He has a right to say, you know what, I don't want to speak with you right now. Well, she does. It depends, I guess, on how she might interpret the question in which she says. She tells him about the search and the computer, which they're talking about at that point, which I interpreted that to mean, he says, what's my right? And she's telling him what's the right vis-a-vis the computer search, which is what they're talking about at that moment. Are there any district court findings on that point? I'm sorry, Your Honor, on the point of? What he was asking about in terms of the scope of his question on the rights. Well, there wasn't a specific district court finding on those facts. However, the district court did find that the facts, the totality of the circumstance and the facts that are indicated by the record and also the audio recording that the district court reviewed and listened to does not indicate that the defendant was in custody at all. Well, see, the difficulty with that is that's the conclusion, whereas if there are underlying facts that the district court found, we would look at those for clear error, the ultimate conclusion of how you put that mix of facts together is something we look at de novo, isn't it? Yes, that's correct, Your Honor. But in this case, if you do look at the facts, the defendant does ask what are my rights just as the agents were talking about whether they could take his computer. And essentially the agent said, we don't have a search warrant. And that's an indication, that's a direct indication to the defendant that they don't have any rights to take his computer if he refuses. And he exercised that right. He said, I prefer that you don't take it. And they didn't. It was only after they got a search warrant that they took the computer. But they abided by his wishes and didn't take it. They were never forceful in any way. Their tone of voice was very calm. It was just asking questions. It wasn't accusatory. The audio recording itself, Your Honor, is just evidence itself, the totality of the case. There was no in-custody interview and there was no coercive environment. So based on the record, Your Honor, and the declaration and the audio recording, what the defense is saying were the facts as far as the agents being forceful in any way. Is there anything that we know from this case as to why they chose to come to the house at quarter to 7 in the morning? Yes. Based on the record, Your Honor, the agent specifically said, we know that you're working, so during the day you're not going to be home. So they came right around 6, I believe around 6.30 or so. Quarter to 7, yeah. Yes. That's when they came because they knew that they could catch him before he went to work. And the defendant claims that the defendant said, listen, I need to go to work, you need to leave. You know, ordinary people, if I want to talk to somebody, I don't go to their house at quarter to 7. I call them on the phone and I ask to make an appointment or can you come to my office or I'll come to your office. I mean, yes, they wanted to catch him, but they wanted to catch him without warning at quarter to 7 when he would be getting ready to go to work. That may be true, Your Honor. However, I don't believe that it's an unusual time to go to a suspect's home and try to speak with them. Well, I think that's right. And I think the reason they're doing it is they're trying to put him off balance, which they succeeded in doing. Yes, and that is a – I don't believe that they're – it's unusual and I don't believe that that necessarily results in a custodial interview. Well, that may be right. It wasn't a social call, let's put it that way. No, it wasn't. No. You know, this case distresses me. Here we have the entire force of the federal government basically working as the She contacts the federal government, and we are now here investing a huge amount of government and judicial time taking care of the revenge of a girlfriend. My reading is that it was not a revenge on a girlfriend. No, revenge by the girlfriend. Revenge by the girlfriend. There was a call. There was a call, and typically the agents will get calls from citizens or they will identify child pornography, possession or downloading through a line wire. Those are one of the typical ways that agents are informed of what's going on. And they have a duty to investigate. When they have information to delete – And the prosecutor has a duty to prosecute. What was the sentence in this case? It's probation, Your Honor. In other words, the judge did not view this as a particularly serious case, although on the other hand, he's now a sex offender for the rest of his life. Well, Your Honor, the facts show that the agents were only able to retrieve around 11 images. Now, when the agents did get a search warrant, there was evidence illuminator 2.0 running on the computer. Yeah, of course. So we believe that most of the images were destroyed, and I believe that the district court judge was taking that into consideration in addition to the fact that the defendant didn't have any criminal history. Yeah. Well, I have to say that this does not strike me as an efficient or wise use of government resources. Thank you. Thank you. Very briefly, Your Honors. Your Honors, I believe that in the inquiry that the – Mr. Tobey made, the response that he's not under arrest, that they don't have a warrant, was to divert his direct – the direct response that should have been that he had a right to an attorney, he had a right not to speak to them. And had they told him that, his actual rights, that he would have exercised those rights or at least had an attorney present. So you're basically saying they should have given him his Miranda rights at that time. Exactly, Your Honor. And I – because they directly accused him of having child pornography on the computer and telling him that it was illegal to have child pornography on his computer. Therefore, they are directly accusing him of committing a crime. They lulled him into a situation where he made these admissions, into a situation where he felt that he was being admonished, that he said to the agents that, well, I'm going to get rid of this stuff. He told them he was going to get rid of some images. But the agents had the ability to find out, even destroy images. And there were very, very few in this particular case, Your Honor. And as regards to the government saying the agents were not accusatory, the evidence is very contrary to that. They directly accused him of having child pornography on the computer and telling him that possession of child pornography was illegal. That is the very definition of being accusatory, Your Honor. And with that, Your Honor, I thank you. Thank you. Thank both counsel for your argument this morning. United States v. Toby is submitted. We'll next hear argument in United States v. Burley.
judges: McKeown, Fletcher W. , Clifton